HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SIERRA CLUB, et al., | No. 12-cv-5669-RBL |
| Plaintiffs, | ORDER |
| v. | (Dkt. #17) |
| KEN SALAZAR, Secretary of the Department of the Interior, et al., | |
| Defendants. | |

In May 2012, the Washington Department of Natural Resources ("DNR") proposed, and the Fish & Wildlife Service approved, an amendment to a habitat conservation plan governing the logging of forests in southwest Washington. Plaintiffs brought suit alleging that Fish & Wildlife failed to take certain statutory steps under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), before approving the amendment. Plaintiffs sent a notice of intent to sue, which is required by the ESA 60 days before filing suit. However, 35 days later, Plaintiffs filed suit. Plaintiffs argue that they have pled only claims under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* ("APA")—which contains no 60-day notice requirement—rather than the ESA. The Government contends that the claims fall in fact under the ESA, and the suit must be dismissed and re-initiated in 60 days.

Order - 1

# I.   FACTUAL BACKGROUND

The background to the case is only marginally relevant to the Motion, and only a bare recitation is necessary.

### A. Washington Department of Natural Resources' Habitat Conservation Plan and the Marbled Murrelet

In 1997, the Washington DNR drafted a habit conservation plan covering approximately 1.8 million acres of land in the state.  The conservation plan controls both logging and protection of endangered and threatened species, including the marbled murrelet, a "dove sized bird . . . in the same family as puffins." (Pl.'s Resp. at 4, Dkt. #36).  After reviewing the conservation plan, Fish & Wildlife issued an "incidental take permit," a permit created by the ESA that allows limited taking of endangered or threatened species.

Although the facts are not entirely clear at this early stage of litigation, DNR set out to study the marbled murrelet and its habit in order to better classify the land, separating areas that are high-quality nesting areas from areas that are less hospitable.  This conservation plan already classifies the land into separate management areas, and it is a shift in logging between these areas that is in dispute.

In 2012, Fish & Wildlife approved a "minor amendment" to the conservation plan.  The Government argues that the amendment moved logging from higher-quality nesting areas to "marginal habit," and thus, the logging will decrease incidental taking.  Because the amendment decreases take, the Government contends, the statutory requirements for a major amendment do not apply.

Plaintiffs argue that the amendment authorized logging in 60% of the higher-quality habitat in southwest Washington, an area much larger than used in Fish & Wildlife's biological opinion.

### B. Plaintiffs' Notice of Intent to Sue

In their notice letter, Plaintiffs first alleged violations of ESA §§ 7 and 10.  Specifically, Plaintiffs alleged that under § 7, Fish & Wildlife should have re-initiated consultation with DNR and completed a new biological opinion before approving the amendment.  (Oliphant Decl., Ex.

Order - 2

1 at 4-9, Dkt. #18-1.)  Second, Plaintiffs alleged that Fish & Wildlife violated § 10 by processing DNR's amendment as a "minor" amendment rather than a "major" amendment.  (*Id.*, Ex. 1 at 12, Dkt. #18-1.)  Major amendments to conservation plans require public comment and the statutory findings required of all incidental take permits (i.e., that takings will be incidental, the agency will minimize impacts and adequately fund the conservation plan, and that the takings will not appreciably reduce a species' chance of survival).  As it considered the amendment to be minor, Fish & Wildlife bypassed these steps.

According to Plaintiffs, after sending their notice of intent to sue, they concluded that their § 10 claims were properly pled ***not*** as ESA claims, but as APA claims.  They therefore filed suit 36 days after the notice letter.

The Complaint largely tracks Plaintiffs' notice letter.  In their first claim (the only claim the Government challenges here), Plaintiffs alleged that Fish & Wildlife violated ESA § 10 and the APA by approving the amendment without public comment or the statutory findings.  Further, Plaintiffs alleged that Fish & Wildlife approved the amendment "without first evaluating the effects of the proposed amendment under ESA section 7."  (Pl.'s Compl. ¶ 61, Dkt. #1.)  Plaintiffs later amended their Complaint removing that language—i.e., the reference to § 7.  (Pl.'s Am. Compl. ¶ 61, Dkt. #15.)  Despite removing the reference to § 7, the Government here asserts that Plaintiffs' first claim is intrinsically tied or analogous to § 7; it is therefore an ESA claim, and 60-days notice is required.

## II.   GOVERNING LAW

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint must allege facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although the Court must accept as true a complaint's well-pled facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper

Rule 12(b)(6) motion. *Vasquez v. L.A. County*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly* ).

### A.   Overview of the Endangered Species Act

In order to enforce its provisions, the ESA creates what is called a "citizen suit," a cause of action that may be filed for certain violations. Under U.S. Supreme Court precedent, however, certain causes of action are pled under the APA. This unfortunate return to form pleading has a crucial impact: the ESA citizen suit requires 60-days notice; the APA claim does not. If the Court allows the suit to proceed as an APA claim, and the Ninth Circuit later disagrees, then all the work of the parties and the Court is lost, and the case must begin again.

In their notice letter, Plaintiffs alleged violations of two sections of the ESA: § 7 and § 10. These two sections are the central characters in this Motion; however, a background to the ESA, and specifically, to §§ 4, 9, and 11, is helpful.

#### 1.   ESA § 4: "Determination of Endangered Species and Threatened Species," 16 U.S.C. § 1533

Under §4, the Secretary of the Interior[1] must create the endangered species list. 16 U.S.C. § 1533(a)(1). The section compels the Secretary to use the "best scientific and commercial data" in reviewing the status of species and mandates the designation of "critical habitat." 16 U.S.C. § 1533 (b)(1)–(2).

---

[1] The term "Secretary" may sometimes refer to the secretaries of the Department of Commerce or the Department of Agriculture, but that point is irrelevant in this case. 16 U.S.C. § 1532(15) (defining "Secretary").

## 2. ESA § 7: "Interagency Cooperation," 16 U.S.C. § 1536

Under § 7, all federal agencies must consult with the Secretary to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species . . . ." 16 U.S.C. § 1636(a)(2). Thus, any "action agency," must coordinate with, for example, Fish & Wildlife, to ensure that its projects do not harm threatened species.

Section 7 also mandates that the Secretary issue what is called a "biological opinion," which details "how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A).

## 3. ESA § 9: "Prohibited Acts," 16 U.S.C. § 1538

Section 9 is the core of the ESA. It prohibits the taking, import, possession, and sale of endangered species. 16 U.S.C. § 1538(a)(1).

## 4. ESA § 10: "Exceptions," 16 U.S.C. § 1539

Despite its bland name, § 10 plays a large role in regulating endangered species—and it is this section that is at the heart of the dispute. Under § 10, the Secretary may issue a permit for the taking of endangered species—takings otherwise prohibited by § 9—if the taking is "*incidental to*, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B) (emphasis added). To issue this permit (an "incidental take permit"), an applicant must submit a conservation plan (like the one submitted by the Washington DNR) and detail how agency actions will impact species, how the agency will mitigate harm, and possible alternative actions. 16 U.S.C. § 1539(a)(2)(A).

Before approving a conservation plan, the Secretary must open the plan to public comment and make certain findings, including that the applicant's actions will result in only "incidental" taking, that the applicant will mitigate impacts, that it will fund the conservation plan, and that the proposed taking will not "appreciably reduce the likelihood of the survival and recovery of the species . . . ." 16 U.S.C. § 1539(a)(2)(B). Plaintiffs believe that Fish & Wildlife needed to make these findings and allow public comment before approving DNR's amendment to its conservation plan.

**5. ESA § 11: "Penalties and Enforcement," 16 U.S.C. § 1540**

Section 11 creates both civil and criminal penalties for violating the ESA. Under § 11, "[a]ny person who knowingly violates . . . any provision of [the ESA] may be assessed a civil penalty by the Secretary of not more than $25,000 for each violation." 16 U.S.C. § 1540(a)(1). Additionally, "[a]ny person who knowingly violates any provision of [the ESA] . . . be fined not more than $50,000 or imprisoned for not more than one year, or both." 16 U.S.C. § 1539(b)(1).

Section 11 also creates citizen suits: "any person may commence a civil suit . . . to enjoin any person, including the United States an any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter . . . ." 16 U.S.C. § 1540(g)(1)(A). A citizen-suit requires, however, 60 days notice to the Secretary of any alleged violation before filing. 16 U.S.C. § 1539(g)(2)(A)(i).

At first blush, the citizen-suit appears incredibly broad: ***any*** person may bring suit against ***any*** agency or entity for ***any*** violation of the ESA. Unfortunately, all is not so simple. The statute contains a conflicting provision. ESA § 11 also contains a second cause of action, permitting suits against the Secretary for violations of § 4 (the section mandating, amongst other things, that the Secretary create the endangered and threatened species list and designate critical habitat). 16 U.S.C. § 1540(g)(1)(C). It is the interaction between the second cause-of-action (specific to the Secretary) and the first cause-of-action (which according to its broad language should include all claims) that gave rise to *Bennett v. Spear*, 520 U.S. 154 (1997).

**B.     The Supreme Court's Interpretation of ESA § 11's Citizen-Suit Provision and APA Claims**

The Supreme Court addressed ESA § 11's citizen-suit and its conflicting provision in *Bennett v. Spear*, 520 U.S. 154 (1997). In *Bennett*, ranchers and irrigation districts challenged a Fish &Wildlife biological opinion, which found that the Klamath reclamation project (a series of dams, lakes, and rivers in southern Oregon) would likely jeopardize the lost river and shortnose sucker fish. *Id.* at 159. The plaintiffs presented claims under two sections: ESA § 4 (challenging

the implicit finding of "critical habitat") and ESA § 7 (challenging the scientific basis of the biological opinion).[2] *Id.* at 160.

The government disputed jurisdiction, arguing that the ESA did not permit citizen-suits against the Secretary. *Id.* at 171. The Court looked at ESA § 11 (the citizen-suit provision), which provides the two causes-of-action discussed above:

> Any person may commence a civil suit . . . :
>
> (A) to enjoin any person, including the United States an any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter . . . ; or,
>
> . . . .
>
> (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title [i.e., ESA § 4, mandating creation of the endangered species list and critical habitat,] which is ***not discretionary*** with the Secretary.

16 U.S.C. § 1540(g)(1) (emphasis added); *see Bennett*, 520 U.S. at 171. The Court held that subsection (C) specifically allows suits under § 1533 (i.e., ESA § 4), and thus, the plaintiffs' claims under § 4 could go forward. (This was the plaintiffs' claim that the biological opinion implicitly designated "critical habitat," which must be done expressly under § 4.) The plaintiffs' claims under § 7, however, were more difficult.

The Court reasoned that if Congress created a specific cause of action against the Secretary ***only*** for violations of non-discretionary duties under § 4—subsection (C)—then Congress could not have intended the Secretary to be sued under subsection (A)—the broad cause of action allowing any suit against any agency. In other words, the second cause of action (subsection (C)) would be unnecessary if the first cause of action (subsection (A)) applied to the Secretary. *Bennett*, 520 U.S. at 173 ("That provision [subsection (C)] would be ***superfluous***— and worse, its careful limitation to § 1533 would be nullified—if § 1540(g)(1)(A) permitted suit against the Secretary . . . ." (emphasis added)).

Further, the Court reasoned that it was unlikely Congress intended the Secretary or the employees of Fish & Wildlife to be subject to civil and criminal penalties if they erred in consulting under the ESA. *Id.* at 173–74. Indeed, subsection (A) allows a citizen to sue for "any

---

[2] The plaintiffs presented three claims, but the claims fell essentially into the two categories listed.

Order - 7

violation" of the ESA, but if the Secretary could "violate" the ESA by, for example, failing to allow public comment on an incidental take permit, he could also be civilly and criminally liable. The Supreme Court found it unlikely that the Congress intended the Secretary to be criminally liable for "violations," and thus, the Secretary's failure to abide his duties in administering the ESA are not "violations" of the ESA. *Id.*

Lastly, the Supreme Court reasoned that if the Secretary's failure in administering the ESA was a "violation," then a plaintiff could file suit for any minor procedural error at any time rather than awaiting "final agency action," as required by the APA. *Id.* at 174.

Given that reasoning, the Court concluded that the plaintiffs' § 7 claims did not fall within subsection (A), the citizen-suit provision. Because the claims could not fall under subsection (C) either (because subsection (C) authorized only § 4 claims), the claims ***must*** fall under the APA, which authorizes review only when "there is no other adequate remedy in a court." *Bennett*, 520 U.S. at 162 (quoting 5 U.S.C. § 704).

In sum, subsection (A) is a "means by which private parties may enforce the ***substantive*** provisions of the ESA against regulated parties—both private entities and Government agencies—but it is not an alternative avenue for judicial review of the Secretary's ***implementation*** of the statute." *Id.* at 173 (emphasis added).

### C. The Ninth Circuit's Decision in *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001)

While *Bennett* holds that a challenge to a completed biological opinion under § 7 is properly pled under the APA, the Government argues that the Ninth Circuit has clarified that certain § 7 claims must be pled under the ESA. (*See* Defs.' Resp. at 17, Dkt. #17) (distinguishing *Simpson Timber* from *Bennett*). In *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001), the plaintiffs challenged Fish & Wildlife's refusal to reinitiate consultation on an incidental take permit under § 7 (the same section at issue in *Bennett* and the same claim listed in Plaintiffs' notice of intent to sue letter). *Id.* at 1074–75; *see* Oliphant Decl., Ex. 1 at 6, Dkt. #18-1 (noting violation for failure to reinitiate consultation). Simpson Timber had obtained an incidental take permit for northern spotted owl,

but after obtaining the permit, Fish & Wildlife listed two additional species as threatened (including the marbled murrelet). *Id.* at 1075.

The Ninth Circuit recognized that under *Bennett*, Fish & Wildlife "could not be sued for maladministration of the ESA" under the citizen-suit provision—those claims fall under the APA. *Id.* at 1079. But, the court of appeals stated that *Bennett* "expressly recognized that citizen suits are a permissible means to enforce the substantive provisions of the ESA against regulated parties—including government agencies like [Fish & Wildlife] in its role as action agency." *Id.* And, according to the Ninth Circuit, the plaintiffs sought to "enforce the substantive obligation imposed on [Fish & Wildlife] to ensure that no action authorized by it is likely to jeopardize a threatened species." *Id.* Because Fish & Wildlife needed to consult *itself*—to ensure that it was not violating § 7 by failing to re-initiate consultation—the claim could be pled under the ESA. *Id.*

This logic appears again, but perhaps more clearly, in *Turtle Island Restoration Network v. National Marine Fisheries Service*, 340 F.3d 969 (9th Cir. 2003). In *Turtle Island*, the Fisheries Service was issuing longline fishing permits under the High Seas Fishing Compliance Act, 16 U.S.C. §5501 *et seq*. *Id.* at 970. The plaintiffs brought § 7 suits, alleging that longline fishing "result[ed] in harm to several endangered and protected species . . . ." *Id.* When the "acting agency is either the Fisheries Service or [Fish & Wildlife], the obligation to consult is not relieved, instead, the agency must consult within its own agency to fulfill its statutory mandate." *Id.* at 973.

Thus, in *Turtle Island*, it is easier to see why the Fisheries Service is the action agency. It was issuing permits not under the ESA, but under the High Seas Compliance Act, and like any entity authorizing conduct that may jeopardize threatened species, it must consult under ESA § 7. In contrast, in *Simpson Timber*, Fish & Wildlife is not initially an action agency. The initiating entity was Simpson Timber—it sought a biological opinion and eventually an incidental take permit. Throughout that process, Fish & Wildlife is a consulting agency, merely "implementing" the ESA. Yet, despite being merely an administrator of the ESA, there is a moment when Fish &

Order - 9

Wildlife becomes the action agency—when it performs a § 7 analysis of its own decision on whether to re-initiate consultation.

Although the confines of *Simpson Timber* are not entirely clear, it appears that at least some § 7 claims against Fish & Wildlife are pled under the ESA and remain subject to the 60-day notice requirement.

### III.   ANALYSIS

The Government acknowledges that Plaintiffs' claim as stated falls under ESA § 10—alleging failure to allow public comment and to make statutory findings. As the Government explains: "[B]y challenging the alleged failure of the agency to follow procedures required of it under Section 10 of the ESA before issuing a Section 10 permit . . . rather than the adequacy of its expert analysis and conclusions following formal consultation (with itself) . . . , the First Claim goes to [Fish & Wildlife] in its role as action agency." (Defs.' Mot. to Dismiss at 2, Dkt. #17.) Thus, while the claim is ostensibly listed under § 10, the Government believes the nature of the allegations implicates Fish & Wildlife's role as an action agency—something akin to its § 7 responsibilities.

In the alternative, the Government argues that if the claim falls under the APA, the Court should preclude Plaintiffs from later amending their Complaint to add § 7 claims that *would* require 60-days notice.

### A.   Plaintiffs' ESA § 10 Claims

The Court must conclude that Plaintiffs' claim falls under the APA. First, § 10 is not, as the *Bennett* court put it, a "substantive provision" rather than an "implementing provision." Although *Bennett* failed to clearly divide substantive provisions from mere implementing provisions, it stated that a "substantive provision" is one that private parties may enforce against "regulated parties—both private entities and Government agencies." *Bennett*, 520 U.S. at 173. But § 10 does not regulate private entities; it pertains only to the Secretary. *See* 16 U.S.C. § 1539 (allowing Secretary to issue incidental take permits, permits to take for scientific purposes, allowing hardship exemptions, requiring Secretary to publish applications and permits in the federal register, and other sections relating to the Secretary).

Second, and perhaps more persuasively, the Court cannot imagine that Congress intended the Secretary's actions under § 10 to be "violations" of the ESA and give rise to civil and criminal liability. In other words, for Plaintiffs' claim to fall under the ESA citizen-suit provision, it must allege a "violation" of the ESA. 16 U.S.C. § 1540(g)(1)(A). But as *Bennett* noted, "the ESA uses the term 'violation' elsewhere in contexts in which it is most unlikely to refer to failure by the Secretary . . . to perform [his] duties in administering the ESA." *Bennett*, 520 U.S. at 173. Thus, if the Government were correct, Plaintiffs might allege that Fish & Wildlife failed to allow public comment on the DNR amendment, and that claim would give rise to civil and criminal liability for Fish & Wildlife employees. Such a result is counter to common sense.

Third, *Bennett*'s policy concerns would be undermined. The Supreme Court noted that "interpreting the term 'violation' to include any errors on the part of the Secretary in administering the ESA" would allow a plaintiff to sue under the ESA citizen-suit provision immediately for "[a]ny procedural default." *Id.* at 174. Thus, interpreting § 10 as potentially giving rise to ESA citizen-suit claims would allow immediate suits for procedural violations (like failing to allow public comment) before Fish & Wildlife had even issued an incidental take permit—undermining "the APA's 'final agency action' requirement." *Id.*

Fourth, it is difficult to apply the Ninth Circuit's reasoning regarding § 7 claims to Plaintiffs' § 10 claims. Indeed, the Ninth Circuit itself seems unclear about its reasoning in *Simpson Timber*. Again, it is easy to see why the Fisheries Service was an action agency in *Turtle Island*, it was issuing fishing permits under a ***completely different*** statute (the High Seas Compliance Act). Thus, all action commenced with the Fisheries Service—it was the original action agency.

But in *Simpson Timber*, the logging company was the original action agent; Fish & Wildlife was consulted to form a biological opinion and eventually issue an incidental take permit. Similarly here, the Washington State DNR is the action agent; Fish & Wildlife was consulted to form a biological opinion and issue an incidental take permit. In both cases, it is

merely administering the ESA. Under *Simpson Timber*, however, Fish & Wildlife becomes an action agency when failing to re-initiate consultation under § 7.

The Ninth Circuit appears uncertain of this leap. It held that "[e]ven if we were to read *Bennett* to preclude citizen-suit standing . . . , [the plaintiff] would still have standing to sue under the APA." *Simpson Timber*, 255 F.3d at 1079. The Ninth Circuit reasoned that the plaintiff in *Simpson Timber* had interests that fell "within the zone of interests" protected by § 7, and therefore had standing to sue under "the APA[] as well as under the citizen-suit provision of the ESA." But it cannot be both: "the APA by its terms independently authorizes review *only* when 'there is no other adequate remedy in a court.'" *Bennett*, 520 U.S. at 161–62 (citing 5 U.S.C. § 704).

Moreover, subsequent Ninth Circuit opinions draw *Simpson Timber*'s holding into question. In *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008), the Ninth Circuit held that the ESA citizen-suit provision authorized "suit against the State Department, as action agency, for failure to comply with its ESA obligations . . . ." *Id.* at 1229. But as for plaintiffs' claim against the Fisheries Service, "the failure to reinitiate § 7 consultation is a final agency action subject to judicial review" under the APA. *Id.* at 1230 (citing, interestingly, *Envtl. Prot. Info. Ctr. v. Simpson Timber*, 255 F.3d 1073, 1079 (9th Cir. 2001)).

Fifth, other courts have considered § 10 claims under the APA. *See Conservation Force v. Salazar*, 753 F. Supp. 2d 29, 34 (D.D.C. 2010); *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1278–79 (S.D. Ala. 1998); *Loggerhead Turtle v. Volusia County*, 120 F. Supp. 2d 1005, 1019–1020 (M.D. Fla. 2000).

In conclusion, Plaintiffs' claim under ESA § 10—that Fish & Wildlife wrongly approved the amendment without public comment and statutory findings—falls properly under the APA and is therefore not subject to the ESA citizen-suit's 60-day notice requirement. The Court must reject the Government's argument that these allegations go to Fish & Wildlife as an action agency.

**B.     Possible Amendment**

The Government argues that Plaintiffs cannot later amend their Complaint to add § 7 claims because such an amendment would circumvent the ESA's 60-day notice requirement. (Defs.' Mot. to Dismiss at 19, Dkt. #17.)  Plaintiffs have not yet filed an amendment or filed a new case with those claims.  The Court will advise Plaintiffs, however, that it agrees with the reasoning in *Proie v. National Marine Fisheries Service*, No. 11-cv-5955, 2012 WL 1536756 (W.D. Wash. May 1, 2012), and *Alliance for the Wild Rockies v. USDA*, No. 11-76-M-CCL, 2013 WL 1385009 (D. Mont. Mar. 26, 2013), both holding that later-filed ESA claims arising from the same conduct, transaction, or occurrence would relate back to the original date of the suit's filing.

### IV.     CONCLUSION

For the reasons stated above, the Government's Motion to Dismiss (Dkt. #17) is **DENIED**.

Dated this 22nd day of July 2013.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE